UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

CLARISSA CRUZ, ROBERT ALLAN
MARTIN and KATRINA MARTIN,
individually and on behalf of all others
similarly situated,

       Plaintiffs,

v.
                                        Case No.: 2:23–cv–14297–AMC

SELENE FINANCE, LP,
a Delaware Limited Partnership,[1]

       Defendant.

_____

**DEFENDANT'S AMENDED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND MEMORANDUM OF LAW IN SUPPORT**

      Defendant, Selene Finance, LP ("**Selene**"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, submits this response in opposition to the Motion for Class Certification [ECF No. 47] (the "**Motion**"), filed by the Plaintiffs, Robert Allan Martin, Katrina Martin (the "**Martins**") and Clarissa Cruz ("**Cruz**") (hereinafter collectively, the "**Plaintiffs**").

## INTRODUCTION

      Plaintiffs seek to certify a class of Florida consumers who received notices of default (the "**Notices of Default**" or the "**Notices**")[2] from Selene, purportedly in violation of the Florida Consumer Collection Practices Act (the "**FCCPA**"). Plaintiffs also seek to certify a sub-class of Florida consumers whose loans were in default when Selene acquired them and who received the Notices, purportedly in violation of the Fair Debt Collection Practices Act (the "**FDCPA**").

      The Court should deny Plaintiffs' Motion for several reasons. As a threshold matter, all three named Plaintiffs lack standing to assert claims because they lack any concrete injury. As a result, Plaintiffs necessarily lack the requisite typicality and adequacy to represent their proposed

---

[1] The Second Amended Complaint incorrectly identifies Selene Finance, LP as a Texas corporation. *See* ECF No. 15 ¶ 9.

[2] Plaintiffs refer to the Notices as "Final Letters."

classes (or any other class). Further, Plaintiffs have also failed to satisfy the demanding standards for class certification. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Accordingly, district courts "must conduct a rigorous analysis to determine whether a class action satisfies Rule 23." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016). Plaintiffs' proposed classes fail to withstand this "rigorous analysis." Even assuming that the Notices violated the FDCPA and/or FCCPA, which Selene disputes, Plaintiffs' Motion ignores the substantial, meaningful differences among the putative class members, including: whether they read the Notices, altered their behavior in response to the Notices (such as by submitting payments to Selene before the expiration date set forth in the Notices), whether they sustained damages and if so, the amount of those damages, whether their loans were incurred "primarily for personal, family, or household purposes," and whether they complied with their mortgages' pre-suit notice and cure requirements. These individual questions, which must be adjudicated for each and every putative class member, overwhelm any common ones. Thus, Plaintiffs' Motion must be denied.

**FACTUAL BACKGROUND**

I.    **Plaintiffs' Loans**

   A.    **The Martins' Loan**

The Martins reside at 137 Flatwoods Loop in Davenport, Florida (the "**Flatwoods Property**"), which was purchased on February 20, 2018 and has been their full-time residence since that date. (Robert Martin Tr. 11:4–25, attached hereto as **Exhibit A**; Katrina Martin Tr. 9:3–10:3, attached hereto as **Exhibit B**)

Robert Martin took out a loan on the Flatwoods Property, evidenced by a promissory note.[3] (Robert Martin Tr. 15:9–24; Martin Dep. Ex. 3.) In the promissory note, he agreed to make monthly principal and interest payments on the first day of each month, beginning April 1, 2018. (Martin Dep. Ex. 3 ¶ 3(A).) He further agreed that if he failed to pay the full amount when due each month, he would be in default. (*Id.* ¶¶ 6(B).) The Martins' mortgage requires the lender to, in the event of default, provide written notice before accelerating the loan and/or foreclosing on the Property, and to give the Martins "a date, not less than 30 days from the date the notice is

---

[3] Katrina Martin co-owns the Flatwoods Property but is not an obligor on the note. (*See* Martin Dep. Exs. 2, 4.)

given . . . by which the default must be cured." (Martin Dep. Ex. 4 ¶ 22.) It also prohibits the parties to the mortgage from commencing any lawsuit "that arises from the other party's actions pursuant to this Security Instrument" without providing written notice and "a reasonable period . . . to take corrective action." (*Id.* ¶ 20.)

The Martins first received a notice of default for the Flatwoods Property on August 15, 2018, from Shellpoint Mortgage Servicing (the prior servicer of their loan) ("**Shellpoint**"). (Katrina Martin Tr. 20:8–19; Robert Martin Tr. 23:2–15; Martin Dep. Ex. 5.) In response, the Martins paid the amount needed to become current. (Katrina Martin Tr. at 22:6–11, 22:6–11; Martin Dep. Exs. 5–6.) They received other notices of default from Shellpoint dated in 2018 and 2019, which stated that if the default was not cured within 45 days, "Shellpoint *intends* to accelerate the [loan] . . . and to take other legally and contractually permitted action to collect the same, including foreclosure[.]" (*See* Martin Dep. Exs. 7, 9, 11 (emphasis added).) Katrina Martin—who exclusively handled the Martins' finances and mortgage payments (Robert Martin Tr. 21:8–13)—understood that if the defaults were not cured, Shellpoint could file a foreclosure case (Katrina Martin Tr. 32:19–23). She testified that in response to the default notices, she would "always make attempts" to either cure the default or work out a payment plan. (*Id.* at 28:2–5.)

The Martins continued to miss payments, and Shellpoint filed a foreclosure action against them on June 3, 2019. (Robert Martin Tr. 34:6–17; Katrina Martin Tr. 32:3–15 Martin Dep. Ex. 12.) While the foreclosure action was pending, Mr. Martin was approved for two trial period plans for a loan modification. (Katrina Martin Tr. 30:5–17, 36:2–19; Martin Dep. Exs. 14, 16.) On April 20, 2020, he was approved for a forbearance plan, which Shellpoint extended several times. (Katrina Martin Tr. 33:6–25, 34:4–20, 39:3–10, 40:13–21; Martin Dep. Exs. 17–20.))

Selene began servicing Mr. Martin's loan on January 4, 2022. (Selene 30(b)(6) Tr. at 153:3–11.) At the time of the servicing transfer, Mr. Martin was in default. (*Id.* at 153:21–24.) On May 20, 2022, the Martins executed a loan modification agreement with Selene, which resulted in the dismissal of the foreclosure case; however, shortly thereafter Mr. Martin fell behind on payments again. (Katrina Martin Tr. 41:19–43:18; Martin Dep. Ex. 21.)

**B.     Cruz's Loan**

Cruz currently resides at 11601 Great Commission Way (the "**GCW Property**") in Davenport, Florida, which she purchased on January 12, 2007. (Cruz Tr. 34:2–35:12, attached hereto as **Exhibit C**; Cruz Dep. Ex. 10.) She took out a mortgage to purchase the GCW Property,

which required her to occupy the Property as her "principal residence" for at least one year, starting 60 days from the January 12, 2007, execution date. (Cruz Tr. 38:4–12; Cruz Dep. Ex. 12 ¶ 6.) Cruz, though, did not move into the GCW Property until the *end* of 2007 at the earliest. (Cruz Tr. 31:16–23, 34:6–23.) For most of 2007 (and possibly into 2008 or 2009), Cruz lived at 10131 Serotina Court (the "**Serotina Property**"), which she also owned at the time. (*Id.* at 15:14–21, 25:6–14, 31:13–20.) On December 22, 2006, several weeks before she purchased the GCW Property, Cruz took out a mortgage on the Serotina Property which, like the GCW mortgage, required her to occupy the Serotina Property as her primary residence for at least one year, beginning 60 days from the execution date. (*Id.* at 20:1–10; Cruz Dep. Ex. 3 ¶ 6.) Cruz apparently complied with this requirement for the Serotina Property loan and received a Florida homestead exemption for the Serotina Property in 2007. (Cruz Tr. 24:9–25:5; Cruz Dep. Ex. 5.)

Cruz's promissory note for the GCW Property required her to make monthly principal and interest payments on the first day of each month, beginning March 1, 2007. (Cruz Dep. Ex. 16 ¶ 3(A).) Like Mr. Martin's promissory note, Cruz's promissory note acknowledged that she would be in default if she failed to make the monthly payment on time. (*Id.* ¶ 6(B).) Cruz's mortgage, also like the Martins' mortgage, requires the lender to, in the event of default, provide written notice before accelerating the loan and/or foreclosing on the Property, and to give Cruz "a date, not less than 30 days from the date the notice is given . . . by which the default must be cured." (Cruz Dep. Ex. 12 ¶ 22.) It requires both parties to provide written notice and a "reasonable" time to cure before initiating any legal proceeding "that arises from the other party's actions pursuant to this Security Instrument." (*Id.* ¶ 20.)

Cruz frequently failed to make her monthly payments on time and received numerous default notices from prior servicers. For example, Chase sent her three notices of default in 2008, which all stated that her "failure to cure the default within 30 days from the date of this notice *will* result (a.) in the entire balance becoming due . . . and (b.) foreclosure by judicial proceeding and sale of real property." (Cruz Dep. Exs. 17–19 (emphasis added).) Cruz could not recall the actions she took in response to these default notices, but believed she would have contacted Chase about curing the default. (Cruz Tr. 51:1–7, 51:18–52:6, 53:5–22.) But Cruz continued missing payments, and on June 19, 2009, Chase filed a foreclosure complaint relating to the GCW Property. (*Id.* at 54:3–6; Cruz Ex. 20.) In response, Cruz filed for bankruptcy, and on October 1, 2010, she executed a modification trial period plan. (*Id.* at 55:22–56:13, 56:16–25; Cruz Dep. Ex. 21.) As a result of

the modification and her bankruptcy, Cruz was able to bring her loan current. (Cruz Tr. 43:22–44:5, 56:2–25, 58:4–9.)

In the years following Cruz's bankruptcy, she received two more notices of default from Seterus, the subsequent servicer of her loan, dated December 15, 2011, and May 9, 2016. (Cruz Dep. Ex. 23.) Both notices warned that Cruz's failure to cure the default by the "Expiration Date" (35 days from the date of the notice) *might* result in foreclosure. (*See id*.). Cruz did not recall receiving the notices or how she addressed them. (Cruz Tr. 58:12–59:22.).

Servicing of Cruz's loan was transferred from Seterus to Bayview Loan Servicing, which sent Cruz *eleven* notices of default from August 2018 to September 2020. (*Id.* at 60:8–61:3; Cruz Dep. Ex. 24). Cruz did not recall reading any of these notices (Cruz Tr. 61:1–13), which all stated that "[f]ailure to cure the default on or before [the expiration date, 35 days from the date of the notice] *may* result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding where applicable, and sale of the property" (Cruz Dep. Ex. 24 (emphasis added).) On September 21, 2020, Bayview approved Cruz for a temporary forbearance plan, which was continued by subsequent servicer Community Loan Servicing. (Cruz Tr. 63:11–64:12, 64:15–65:16; Cruz Dep. Exs. 25–26.)

Community Loan Servicing sent Cruz yet another default notice on August 16, 2021, which warned that failure to cure the default by September 20, 2021 "*may* result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding where applicable, and sale of the property." (Cruz Dep. Ex. 29 (emphasis added).) Cruz could not recall what she did in response to this default notice, but testified she did not react any differently than she had to the other notices. (*Id.*; Cruz Tr. 68:8–69:14, 72:5–20).

Selene began servicing Cruz's loan on or about October 26, 2021. (Selene 30(b)(6) Tr. at 150:22–151:1). At the time of the servicing transfer, Cruz was in default. (*Id.* at 153:21–24.)

## II.   <u>The Notices of Default</u>

The Martins received a Notice of Default from Selene on or around August 16, 2022. Cruz received three Notices of Default from Selene, on or around January 17, 2023, March 20, 2023, and May 17, 2023. (Martin Dep. Ex. 22; Cruz Dep. Exs. 30–32.) These Notices of Default mirrored the language in the Martins' and Cruz's mortgages requiring the lender to provide written notice prior to acceleration and/or foreclosure, and to give the borrower a cure date at least 30 days from the date of the notice. (Martin Dep. Ex. 4 ¶ 22; Cruz Dep. Ex. 12 ¶ 22.) Each Notice stated that

failure to cure the default within 35 days of the Notice's date "may result in acceleration of the sums secured by the Security Instrument, sale of the property and/or foreclosure by judicial proceeding and sale of the property." (Martin Dep. Ex. 22; Cruz Dep Exs. 30–32.)

Despite its similarity to the many earlier notices the Martins received, none of which triggered much of any reaction, Katrina Martin[4] claimed that the August 16, 2022 Notice of Default came as a "shock," in part because it arrived at a difficult time in the Martins' personal lives. (Katrina Martin Tr. 43:22–44:23.) She immediately called Selene after receiving it to discuss the late charges, which she believed were "very excessive." (*Id.* at 44:9–45:17, 58:19–59:5.) She testified that if the Notice had given a later payment date, she "still would have paid my mortgage payment . . . But I would not pay those excessive like $2,000 of [late] fees that I can't explain and never got a real clarification on." (*Id.* at 62:17–25.) However, she later admitted that the Martins did not actually pay any of the disputed late charges and did not take any action in reliance on the Notice of Default. (*Id.* at 63:4–20, 64:10–24.)

Like the Martins, Cruz claimed that the January 17 and March 20 Notices caused her anxiety and arrived at a difficult time in her personal life. (Cruz Tr. 70:3–18, 73:17–20.) She testified that she borrowed against her retirement funds twice to pay her mortgage but could not remember the dates of those withdrawals. (*Id.* at 78:16–79:8.) She only produced documentation of one withdrawal, dated May 18, 2023, and testified that she used these funds to pay the cure amount from the March 20th Notice of Default. (*Id.* at 81:2–17, 85:7–20; Cruz Dep. Ex. 34.) Notably, though, Cruz withdrew the funds three weeks *after* the March 20th Notice's cure date, and she also withdrew less than the full amount needed to cure. (*See id.* at 85:7–86:8.) Cruz specifically denied that she was harmed in any way after receiving the May 17th Notice of Default. (*Id.* at 75:21–76:13.)

Plaintiffs have not alleged that they gave Selene any pre-suit written notice of their position that the Notices of Default, which were required by paragraph 22 of Plaintiffs' mortgages, violated the FDCPA or FCCPA. Nor have they submitted any evidence (either through documents or deposition testimony) that such written notice was provided to Selene.

---

[4] As discussed further in Part III, Robert Martin did not always read letters related to the loan because his wife had full control of the household's finances. (Robert Martin Tr. 21:10–23.) He could not specifically recall receiving the August 16, 2022 Notice of Default, nor could he recall whether he read it at the time. (*Id.* at 48:5–17; Martin Dep. Ex. 22.)

## LEGAL ARGUMENT

### I.      Legal Standard for Class Certification

"All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Brown*, 817 F.3d at 1233. "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This is an evidentiary burden, not a mere pleading requirement. *See Brown*, 817 F.3d at 1234.

Rule 23(a) requires plaintiffs moving for class certification to demonstrate: (1) numerosity, (2) questions of law or fact common to the class, (3) typicality, and (4) adequacy. *See* Fed. R. Civ. P. 23(a). All four factors must be met before a class is certified. *See id.* Where, as here, plaintiffs seek certification of a class under Rule 23(b)(3), they must also demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).[5]

Not only must the plaintiffs satisfy the Rule 23 requirements to justify class certification, but each of the named plaintiffs must also have standing to assert their own claims. *See City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002); *Carter v. W. Pub. Co.*, 225 F.3d 1258, 1267 (11th Cir. 2000). Therefore, "any analysis of class certification must begin with the issue of [the plaintiffs'] standing," *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987), even before the court considers the Rule 23 criteria. *See Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001); *Hernandez v. Medows*, 209 F.R.D. 665, 667–68 (S.D. Fla. 2002).

### II.     Plaintiffs Lack Standing to Assert Claims Because They Have Not Sustained a Concrete Injury.

In a putative class action, the "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (citation omitted). They "must demonstrate standing for each claim [they] seek[] to press."

---

[5] Plaintiffs incorrectly state that they must only "satisfy one" of Rule 23(b)(3)'s requirements. *See* ECF No. 48 at 6. To maintain a class under Rule 23(b)(3), Plaintiffs must satisfy *both* elements: (1) predominance, and (2) superiority. *See Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1268–69 (11th Cir. 2009) (holding that analyzing only the superiority requirement and not the predominance requirement "would constitute an obvious abuse of discretion and clear reversible error").

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). To establish Article III standing, each named plaintiff must show that he or she "suffered an injury in fact" that: (1) is "concrete, particularized, and actual or imminent," (2) was "likely caused by the defendant," and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Plaintiffs allege that Selene's Notices of Default caused them to "experience[] anxiety, stress, anger, frustration, and mental anguish." ECF No. 15 ¶¶ 40, 47, 54. They also allege that Selene has violated their "statutory right to be free from abusive debt collection practices." *Id* ¶¶ 40, 47, 54, 79, 105, 130, 155. Lastly, they claim that the Notices "have the potential of causing individuals . . . to send additional money to Selene that, absent the false and misleading statements, they could have utilized on other necessary expenditures[.]" *Id.* ¶ 32.[6]

All three Plaintiffs reiterated in their depositions that the Notices of Default had caused them stress and anxiety, and that they found the Notices "threatening." (*See* Robert Martin Tr. 62:16–20; Katrina Martin Tr. 44:3–23, 47:2–48:1; Cruz Tr. 73:2–7, 74:3–17.) Robert Martin could not identify any non-emotional injury that he sustained from the Notice. (Robert Martin Tr. 49:21– 50:3, 61:2–24.) Katrina Martin testified that she believed the time she spent on the phone with Selene "trying to get somebody to help me" was "damaging," but could identify no other alleged injury caused by the Notice—she admitted that she did not pay any of the disputed late charges or take any particular action in reliance on the Notice, other than calling Selene. (*Id.* at 48:7–13, 62:12–22, 63:4–12, 65:13–22.) In fact, after receiving the Notice the Martins did not make any payments on their mortgage for over one year. (*Id.* at 63:4–12.) Cruz claimed that she had to dip into her retirement funds twice to cure the defaults identified in the Notices but could not recall the dates of the withdrawals and only produced documentation of one, dated May 18, 2023. (Cruz Tr. at 78:16–79:8, 81:2–17; Cruz Dep. Ex. 34.) She testified that she used the funds withdrawn on May 18th to pay part of the cure amount from the March 20th Notice—three weeks after the Notice's cure date. (*See id.*)

The foregoing alleged injuries are either not sufficiently "concrete, particularized, and actual or imminent," or else were not caused by Selene's Notices. *See TransUnion*, 141 S. Ct. at 2203. Plaintiffs have failed to establish that they took *any* adverse actions in reliance on the so-called "false deadlines" in the Notices, *see* ECF No. 15 ¶ 29, and therefore lack standing. Without

---

[6] This allegation, in any event, does not make sense—there is no dispute that the only sums demanded were already owed and there was no demand for "additional money."

standing, Plaintiffs "do[] not have the requisite typicality" to raise claims on behalf of a class. *See Prado-Steiman*, 221 F.3d at 1279; *see also, e.g.*, *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1265 (S.D. Fla. 2021).

     **A.**    **Alleged Violations of the FDCPA and FCCPA, Without an Accompanying Concrete Injury, Cannot Confer Article III Standing.**

The mere fact that Selene is alleged to have violated Plaintiffs' "statutory right to be free from abusive debt collection practices" does not in and of itself give rise to Article III standing in this case. As the Supreme Court explained in *Spokeo*, a plaintiff does not "automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U.S. at 341. To the contrary, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. "To determine whether an intangible injury [such as a statutory violation] is sufficiently concrete, [courts] must look to both history and the judgment of Congress." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 997 (11th Cir. 2020) (citing *Spokeo*, 578 U.S. at 340–41.)

In *Trichell*, the Eleventh Circuit analyzed whether the plaintiffs had Article III standing to bring FDCPA claims based on their receipt of "misleading and unfair" collection letters, where the plaintiffs had no evidence "that they relied on the representations, much less that the reliance caused them any damages." *See* 964 F.3d at 995, 998. Looking to "both history and the judgment of Congress," the court concluded that the plaintiffs "did not suffer an injury in fact when they received allegedly misleading communications that did not mislead them" even if those communications did violate the FDCPA. *Id* at 1005; *see also id.* at 1000 (holding that "the FDCPA's narrow findings and cause of action . . . suggest no congressional judgment firm enough to break with centuries of tradition indicating that misrepresentations are not actionable absent reliance and ensuing damages.").

While *Trichell* only addressed the FDCPA, Florida federal courts have found that its holding applies with equal force to FCCPA claims. *See Gartrell v. J.J. Marshall & Assocs., Inc.*, 2022 WL 376050, at *1 (M.D. Fla. Feb. 8, 2022); *Davis v. Pro. Parking Mgmt. Corp.*, 2022 WL 17549961, at *3 (S.D. Fla. Oct. 31, 2022), *aff'd in part, remanded in part on other grounds*, 2023 WL 4542690 (11th Cir. July 14, 2023); *see also* Fla. Stat. Ann. § 559.77(5) ("In applying and construing this section, due consideration and great weight shall be given to the interpretations of . . . the federal courts relating to the [FDCPA].").

The foregoing case law is dispositive: Selene's alleged violations of the FDCPA and FCCPA, without accompanying concrete injuries, do not give Plaintiffs (or putative class members, as discussed below in Part IV.A.1) standing to sue.

**B.     Plaintiffs Cannot Establish Standing by Alleging that Notices Have the "Potential to Mislead."**

Nor can Plaintiffs rely on any alleged "potential" to mislead borrowers gives Plaintiffs Article III standing. *See* ECF No. 15 ¶ 32 (alleging that Notices "have the *potential* of causing individuals . . . to send additional money to Selene that, absent the false and misleading statements, they could have utilized on other necessary expenditures" (emphasis added)). The Supreme Court rejected that same argument in *TransUnion*, holding that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm."[7] 141 S. Ct. at 2210–11 (emphasis original). Further, under *Trichell*, Plaintiffs "cannot prove standing merely by alleging risks posed to consumers other than themselves." 964 F.3d at 1002; *Prado-Steiman*, 221 F.3d at 1279 ("[I]t is not enough that the conduct of which the plaintiff complains will injure someone.").

Also, making a payment that is due and owing under a borrower's note is not paying "additional" money—the borrower is paying money that is undisputedly due to the lender. Selene's Notices do not ask borrowers to pay ahead or make prepayments on their principal balances, which would be "additional" payments. Selene's Notices merely ask borrowers to pay money that the borrowers already have a legal obligation to pay. None of this represents a concrete injury, so Plaintiffs lack Article III standing.

**C.     Plaintiffs' Claimed Emotional Harms Are Insufficient to Confer Article III Standing.**

"The Eleventh Circuit 'ha[s] not yet decided in a published opinion whether emotional distress alone is a sufficiently concrete injury for standing purposes.'" *Luce v. LVNV Funding LLC*, 2023 WL 1472582, at *4 (S.D. Fla. Jan. 18, 2023) (quoting *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, 2022 WL 4091738, at *4 (11th Cir. Sept. 7, 2022)). However, in an unpublished opinion that applied both *Spokeo* and *Trichell*, it held that an "asserted injury of confusion" could *not* confer standing to raise FDCPA claims based on allegedly improper debt collection letters. *See Cooper v. Atl. Credit & Fin. Inc*, 822 F. App'x 951, 955 (11th Cir. 2020).

---

[7] There is no such separate concrete harm for the reasons discussed in Sections II.C–II.E, below.

Further, other federal circuit courts have concluded that allegations of anxiety and stress caused by communications from debt collectors are *not* sufficient to confer Article III standing. *See Garland v. Orlans, PC*, 999 F.3d 432, 440 (6th Cir. 2021); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 775 (2023). Multiple Florida federal courts have likewise declined to find that allegations of emotional distress can support standing to assert FDCPA claims. *See Luce*, 2023 WL 1472582, at *5; *Baron v. Syniverse Corp.*, 2022 WL 6162696, at *7 (M.D. Fla. Oct. 7, 2022); *Preisler v. Eastpoint Recovery Grp., Inc.*, 2021 WL 2110794, at *5 (S.D. Fla. May 25, 2021).

These cases are consistent with the FDCPA and FCCPA's civil remedies provisions, which allow plaintiffs to recover "actual damages" and "additional" statutory damages. 15 U.S.C. § 1692k; Fla. Stat. Ann. § 559.77(2); *see also Trichell*, 964 F.3d at 1000 (holding that FDCPA's private cause of action provision "suggests that Congress viewed statutory damages not as an independent font of standing for plaintiffs without traditional injuries, but as an 'additional' remedy for plaintiffs suffering 'actual damage' caused by a statutory violation."). Negative feelings alone cannot be quantified as "actual damages" incurred by taking some action in reliance on the Notices' alleged misrepresentations. [8]

Here, Plaintiffs have only claimed that the Notices caused them to feel various negative emotions, without any accompanying physical or economic injury. As the above-cited cases hold, such allegations cannot confer standing in cases like this one. Moreover, Plaintiffs were experiencing difficult events in their personal lives that may have contributed to their emotional reaction to Selene's Notices. (*See, e.g.*, Cruz Tr. 73:11–24, 74:7–17; Katrina Martin Tr. 42:17–43:12, 44:1–25.) Even if this Court were otherwise inclined to deviate from the litany of cases above, Plaintiffs cannot establish that their emotional distress was caused entirely by Selene, and there is no legitimate way to determine how much of their distress was in fact caused by the circumstances in their personal lives. *See TransUnion*, 141 S. Ct. at 2203 (injury must be "likely caused by the defendant"). In sum, Plaintiffs' unquantifiable emotional harms—to the extent they

---

[8] Likewise, Plaintiffs can only recover "pecuniary damages" for their negligent misrepresentation claim, since they have not alleged that the Notices caused them physical harm. *See Holguin v. Celebrity Cruises, Inc.*, 2010 WL 11602745, at *1 (S.D. Fla. June 4, 2010); *see also, e.g., Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003).

were caused in whole or in part by Selene—are not sufficiently concrete to confer Article III standing.

**D.      The Time Katrina Martin Spent on the Phone with Selene Cannot Confer Standing in this Case.**

The only other "harm" identified by the Martins is the time Katrina Martin spent on the phone with Selene "trying to get somebody to help me." (Katrina Martin Tr. 48:4–13.) But *Trichell* is clear that where a plaintiff sues based on allegedly false and misleading statements in a debt collection letter, she must provide evidence that she relied on the representations and sustained damages caused by that reliance. *See* 964 F.3d at 995, 998. Calling Selene to discuss the Notice is not an action taken in reliance on the Notice's allegedly "false deadline," especially because Mrs. Martin testified that, when she received prior default notices from Shellpoint, she would contact them and would "always make attempts" to work something out. (Katrina Martin Tr. 28:2–7, 23:20–24:1.) In other words, Mrs. Martin usually called her loan servicer when she received a default notice, so the Notice at issue here did not cause her to change her behavior or do anything different from what she had always done.

Additionally, while lost time can give rise to standing in other contexts, the Eleventh Circuit has conclusively held that such allegations must be pleaded. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 930–31 (11th Cir. 2020). Plaintiffs' Second Amended Complaint does not contain any "wasted time" allegations. Katrina Martin's deposition testimony also "alleges wasted time only generally," which is insufficient, *see Salcedo v. Hanna*, 936 F.3d 1162, 1168 (11th Cir. 2019), especially because Mrs. Martin contacted the servicer whenever she received a default notice. Without evidence that she spent more time talking to Selene than she did discussing similar notices with Shellpoint, Katrina Martin has no evidence that *any* of her time was wasted by Selene's Notice and does not have standing to sue on this ground, even if she could overcome *Trichell* and *Mursansky*.

**E.      Cruz Cannot Prove that She Withdrew Any Retirement Funds in Reliance on the Cure Dates in the Notices of Default.**

Finally, Cruz's claim that she twice used retirement funds to pay her mortgage does not give her standing to sue. Cruz could not recall the dates of the withdrawals and only produced documentation of one, dated May 18, 2023. (Cruz Tr. 78:16–79:11, 81:2–15, 85:7–20; Cruz Dep. Ex. 34.) However, she used the funds withdrawn on May 18th to pay only part of the cure amount from the March 20th Notice of Default, three weeks *after* the March 20th Notice's cure date. (*See*

*id.*) She therefore cannot argue that she withdrew the money in reliance on the allegedly "false deadline" in the March 20th Notice, because she made the payment well after the cure date had elapsed—and even then, only paid part of the total amount owed. (Cruz Tr. 78:16–79:11, 81:2–15; Cruz Dep. Ex. 34.) Also, at most Cruz has shown that she made a monthly payment that she *already* owed. If she is alleging that she made the payment sooner than she otherwise would have if the Notice had provided a later cure date, she has not provided any evidence of how she was harmed by paying the delinquent amount earlier. Thus, Cruz lacks standing to sue. *See Trichell*, 964 F.3d at 1000 (FDCPA plaintiffs alleging misrepresentations "must show reliance and ensuing damages").

### III.   Plaintiffs Cannot Satisfy Rule 23(a)'s Typicality or Adequacy Requirements.

Because none of the named Plaintiffs have standing to sue, they "do[] not have the requisite typicality" to raise claims on behalf of a class. *See Prado-Steiman*, 221 F.3d at 1279. For the same reason, they are not adequate representatives—without compensable injuries of their own, they cannot "share common interests with the class members and seek the same type of relief for themselves as for the class." *See In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 656, 672 (S.D. Fla. 2015) (explaining adequacy requirement).

Moreover, because the Plaintiffs did not provide the pre-suit notice required by their mortgages, their individual claims are barred, and they cannot adequately represent the class. *See Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (named plaintiffs whose own claims were barred by the statute of limitations could not represent the class); *Camafel Bldg. Inspections, Inc. v. Bellsouth Advert. & Publ'g Corp.*, 2008 WL 649778, at *9 (N.D. Ga. Mar. 7, 2008) (finding named plaintiffs were not adequate representatives where they were individually "barred from recovery against defendant under the voluntary payment doctrine"). "The notice and cure provision of a mortgage bars a plaintiff's claims where it 'applies by its terms to the action" *Kurzban v. Specialized Loan Servicing, LLC*, 2018 WL 1570370, at *2 (S.D. Fla. Mar. 30, 2018) (internal quotations and alterations omitted)); *see also id.* at *1–3 (dismissing claims for failure to comply with notice and cure provision, including claim that the defendant's notice of default "included time-barred debts and other improper fees in violation of the [FDCPA]"); *Sotomayor v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 3163074, at *3 (S.D. Fla. Feb. 5, 2016) (dismissing FDCPA and TILA claims based on servicer's assessment of allegedly inflated property inspection fees for failure to comply with mortgages notice and cure provision). Here, Plaintiffs' mortgages

prohibit the commencement of any lawsuit "that arises from the other party's actions pursuant to this Security Instrument" without providing written notice and a reasonable opportunity to cure. (Martin Dep. Ex. 4 ¶ 20; Cruz Dep. Ex. 12 ¶ 20.) Selene was required to send the Notices of Default under paragraph 22 of Plaintiffs' mortgage, so Plaintiffs' claims therefore "arise[] from [Selene's] actions pursuant to" their mortgages. (Martin Dep. Ex. 4 ¶¶ 20, 22; Cruz Dep. Ex. 12 ¶¶ 20, 22). Plaintiffs' failure to provide such notice is fatal to their claims, *see Kurzban*, 2018 WL 1570370, at *2, meaning they cannot represent the putative class.

Aside from the adequacy issues common to all Plaintiffs, Robert Martin is not an adequate representative because he could not recall reading Selene's Notice of Default at the time the Martins received it in August 2022, let alone whether the Martins took any action in reliance on the Notice. (Robert Martin Tr. 48:8–12, 49:16–19, 61:2–24.) Indeed, Mr. Martin could not even answer questions about which representations in the Notice were purportedly false or misleading. (*See id.* at 59:11–22, 60:24–61:1.)

Cruz also cannot show typicality because she is subject to a unique defense. She did not take out her loan on the GCW Property "primarily for personal, family, or household purposes" and accordingly cannot satisfy an essential element of Plaintiffs' FDCPA and FCCPA claims. *See* 15 U.S.C. § 1692a(5); Fla. Stat. Ann. § 559.55(6); *see also infra* Part IV.A.3. To determine the purpose of an obligation, was the Eleventh Circuit considers the nature of the transaction at the time the transaction took place. *See Surber v. McCarthy, Burgess & Wolf, Inc.*, 634 F. App'x 292, 294–96 (11th Cir. 2015). When Cruz purchased the GCW Property on January 12, 2007, she was still living at the Serotina Property, and she maintained her primary residence at the Serotina Property for (at least) eleven months before she eventually moved into the GCW Property, even claiming a Florida homestead exemption for the Serotina Property in 2007. (*See* Cruz Dep. Exs. 5, 10; Cruz Tr. 24:9–15, 31:13–20, 34:6–22.) Thus, at the time of the transaction, Cruz did not incur the obligation on the GCW Property "primarily for personal, family, or household purposes." Given this unique defense, Cruz cannot meet Rule 23(a)(3)'s typicality requirement. *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000) ("Typicality is not present if the class representatives are subject to unique defenses that could be central to the litigation.").

## IV.   Plaintiffs Cannot Satisfy Either Element of Rule 23(b)(3).

Plaintiffs also cannot meet *either* of Rule 23(b)(3)'s prerequisites: predominance and superiority.

### A.   Common Questions Do Not Predominate Over Individualized Questions.

Plaintiffs wrongly claim that liability and damages involve only common issues, and Selene's Notices and policies are not sufficient to overcome the numerous individual issues presented in this case. Rule 23(b)(3) "requires a court to find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 569 U.S. at 33 (2013) (quoting Fed. R. Civ. P. 23(b)(3)). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997). For this factor, the court has a "duty to take a 'close look' at whether common questions predominate over individual ones"—a question far "more demanding" than whether there are common questions at all. *Comcast*, 569 U.S. at 34. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

### 1.   Whether Class Members Have Standing Is an Individualized Question.

Each putative class member must individually demonstrate that he or she has Article III standing to recover damages. *TransUnion*, 141 S. Ct. at 2208. The Court need not determine whether putative class members do in fact have standing at the class certification stage, but "it must determine whether the issue of standing for putative class members will require individualized inquiries that predominate over the common issues." *Barnes v. Allsup Emp. Servs., LLC*, 2022 WL 2390715, at *7 (S.D. Fla. July 1, 2022); *see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019) ("[A]t some time in the course of the litigation the district court will have to determine whether each of the absent class members has standing before they could be granted any relief. That is an individualized issue[.]"). In this case, putative class members' standing will require multiple individualized inquiries that predominate over any "common issues" identified by Plaintiffs.

As discussed *supra* Part II, the mere fact that Selene sent a Notice of Default to a borrower cannot confer Article III standing. Rather, a borrower can only recover damages if the borrower *received* the allegedly "misleading" communication and then was actually "*misled*." *See Trichell*, 964 F.3d at 994, 998; *see also Scalero*, 352 So. 3d at 934 (justifiable reliance is an essential element of a negligent misrepresentation claim). Plaintiffs claim that Selene's Notices contain "false deadlines" that have the "potential" to mislead consumers into paying money that "they could have utilized on other necessary expenditures," because Selene does not accelerate or initiate foreclosure proceedings until a loan is 120 days' delinquent. *See, e.g.*, ECF No. 15 ¶¶ 21, 29, 32. Thus, to have standing to sue, a class member must have taken some action in reliance on the allegedly "false deadline" in the Notice and sustained damages as a result. This is a necessarily individualized and fact-intensive inquiry.

Taking Plaintiffs' allegations about the Notices' "false and misleading" content as true, to establish standing, each class member would still need to show that he or she: (1) received the Notice of Default, (2) read the Notice (there may be many putative class members who, like Mr. Martin,  never read the Notice), (3) relied on the Notice to their detriment by, *e.g.*, making a payment to Selene that he or she otherwise would not have made but for reading the Notice, (4) using funds that would have otherwise used on another expenditure, based on a misapprehension of when Selene would accelerate and foreclose. "At some point before it may order any form of relief to the putative class members," the Court will have to determine whether each putative class member satisfies the foregoing criteria, "to sort out those plaintiffs who were actually injured from those who were not." *Cordoba*, 942 F.3d at 1264. Such an individualized analysis cuts against predominance. *See id.* at 1274–75; *see also Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1316 (11th Cir. 2023) ( "Rule 23(b)(3) certification was improper for classes that require individualized proof of each plaintiff's reliance on Ford's alleged misstatements[.]"); *Heffner v. Blue Cross & Blue Shield of Alabama, Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006) ("In a variety of contexts, we have held that the reliance element of a class claim presents problems of individualized proof that preclude class certification.").

### 2.      Class Members' Damages Require Individualized Proof.

Once the Court has separated "those plaintiffs who were actually injured from those who were not," (and assuming only for this argument that Selene's Notices did contain inaccurate information) the calculation of the "injured" class members' damages would entail a separate

individualized inquiry. The FDCPA and FCCPA authorize recovery of "actual damages" and "additional" statutory damages—meaning if there are no actual damages, there are no statutory damages. *See* U.S.C.A. § 1692k; Fla. Stat. Ann. § 559.77(2); *Trichell*, 964 F.3d at 1000. Negligent misrepresentation claims similarly require proof of "pecuniary damages," unless the negligent misrepresentation causes physical harm. *See Holguin*, 2010 WL 11602745, at *1 (citing Restatement (Second) of Torts §§ 311, 552).

Plaintiffs, therefore, are wrong in claiming that class damages "can be decided formulaically without any individualized inquiry as those who received multiple letters will simply receive the same statutory damages," *see* ECF No. 48 at 18, because only individuals with actual monetary damages are entitled to statutory damages. Plus, Plaintiffs have expressly asked the Court to award both actual and statutory damages. ECF No. 15 ¶¶ 90, 116, 141, 165, 201; *see also id.* at Prayer for Relief ¶ C. Here, actual damages will vary widely across class members. Plaintiffs have not presented any methodology for how they propose to calculate actual damages on a class-wide basis for any of their claims. *Chudner v. Transunion Interactive, Inc.,* 2010 WL 5662966, at *1 (D. Del. Dec. 15, 2010) (denying class certification because plaintiff failed to establish how actual damages would be proven with evidence common to the class).

"To calculate actual damages in this case would necessarily involve an inquiry into the individual circumstances of each class member," and this individualized issue further cuts against class certification. *See Arnstein v. Phillips*, 2023 WL 7129909, at *10 (S.D. Fla. Sept. 26, 2023).

### 3. Whether Class Members' Loans Were Taken Out Primarily for Personal, Family, or Household Purposes Is an Individualized Question.

The individualized issues in this case do not only pertain to class members' claimed injuries and damages. Determining whether each putative class member satisfies the FDCPA and FCCPA's requirement that the class member's debt be "primarily for personal, family, or household purposes" would likewise require the Court to engage in a case-by-case investigation of each potential class member's loan. *See* 15 U.S.C. § 1692a(5); Fla. Stat. Ann. § 559.55(6).

The Court must look to the nature of the transaction at the time it took place to decide whether it arose "primarily for personal, family, or household purposes." *See Surber*, 634 F. App'x at 294–96. This determination "is a fact-specific analysis and courts should examine 'the transaction as a whole' to determine if it was primarily consumer or commercial in nature." *Martin v. Allied Interstate, LLC*, 192 F. Supp. 3d 1296, 1305–06 (S.D. Fla. 2016) (citing cases). Based on

the analysis's fact-intensive nature, courts have found that that the "primarily for personal, family, or household purposes" requirement creates individualized inquiries ill-suited for class treatment. *See Corder v. Ford Motor Co.*, 283 F.R.D. 337, 341 (W.D. Ky. 2012) (finding that that "the question of why any particular customer purchased the pickup truck is not something that can be resolved on a class-wide basis," thereby "destroy[ing] the predominance of class-wide issues"); *Lowe v. Maxwell & Morgan PC*, 322 F.R.D. 393, 402 (D. Ariz. 2017) (finding no predominance in part because "[t]he Court . . . would need to examine the circumstances surrounding each putative class member's home purchase to determine the purpose of the transaction"); *cf. Riffle v. Convergent Outsourcing, Inc.*, 311 F.R.D. 677, 680 (M.D. Fla. 2015) (denying class certification because the purpose of the class members' loans was not readily ascertainable).

Although some courts have found this element to be susceptible to class-wide proof, they have typically done so based on a finding that written records will clearly evidence the nature of the debt. *See, e.g.*, *Swanson v. Mid Am, Inc.*, 186 F.R.D. 665, 669 (M.D. Fla. 1999); *Marti v. Schreiber/Cohen, LLC*, 2020 WL 30421, at *3 (D. Mass. Jan. 2, 2020); *Eatmon v. Palisades Collection LLC,* 2011 WL 147680, at *5 (E.D. Tex. Jan. 18, 2011). Here, Cruz's deposition shows why written records alone would *not* be sufficient proof that a loan was taken out "primarily for personal, family, or household purposes." Cruz signed a mortgage for the GCW Property that required her to occupy the Property as her "principal residence" for at least one year, starting 60 days from the January 12, 2007, execution date. (*See* Cruz Dep. Ex. 12 ¶ 6.) Yet she testified that the Serotina Property was her primary residence in 2007, and she received a Florida homestead exemption for the Serotina Property in 2007. (Cruz Tr. 24:9–15, 31:13–20, 34:6–22; Cruz Dep. Ex. 5.) And, shortly before she took out the mortgage on the GCW Property, she took out a mortgage on the Serotina Property, which required her to occupy the *Serotina Property* as her primary residence for at least one year. (*Id.* at 20:15–25, 23:9–18; Cruz Dep. Ex. 3 ¶ 6.) Had it not actually deposed Cruz, Selene would not have known that she did not occupy the GCW Property as her principal residence until almost a year or a more after she purchased it. As Cruz shows, the Court cannot determine the purpose of putative class members' loans solely from reviewing their loan documents.

Selene is aware of no way to reliably determine the purpose of class members' loans here without deposing each class member. Plaintiffs, who bear the burden of proving that their proposed classes should be certified, have not proposed *any* class-wide methodology for evaluating the

purpose of class members' loans, let alone a methodology that is reliable. *See Riffle*, 311 F.R.D. at 681 (denying motion for class certification where the plaintiff had not presented any methodology to determine the purpose of class members' loans, beyond "simply intimat[ing] that the records of Defendants or the original creditor will be useful in identifying potential class members."). Instead, this determination would require a significant individualized inquiry that undercuts the predominance requirement and render class certification inappropriate.

> **4.      Whether Class Members Provided Sufficient Pre-Suit Notice Is an Individualized Question.**

As discussed, Plaintiffs' mortgages require that they provide pre-suit notice and an opportunity to cure before filing a lawsuit "that arises from [Selene's] actions pursuant to this Security Instrument." (Martin Dep. Ex. 4 ¶ 20; Cruz Dep. Ex. 12 ¶ 20.). This requirement is part of their mortgages' "Uniform Covenants." (*See id.*) Whether class members also complied with their mortgages' pre-suit notice and cure provision is yet another individualized issue that cuts against class certification. *See Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 625 (S.D. Fla. 2008) ("[E]ach putative class member must demonstrate that he or she gave the required notice of the breach to Defendant within a reasonable time pursuant to Fla. Stat. Section 672.607; clearly, this is an individualized factual inquiry[.]'"); *see also Sanchez-Knutson v. Ford Motor Co.*, 2016 WL 11783302, at *4 (S.D. Fla. July 25, 2016); *cf. Oginski v. Paragon Properties of Costa Rica, LLC*, 282 F.R.D. 672, 678 (S.D. Fla. 2012) ("The class's susceptibility to individualized affirmative defenses mitigates against class treatment under Rule 23(b)(3).").

> **B.      A Class Action Is Not Superior.**

Rule 23(b)(3) also requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" before certifying a class. The Rule lists non-exclusive factors for the courts to consider, which include, *inter alia*, class members' interest in bringing individual lawsuits, the existence of other litigation, and "the likely difficulties in managing a class action." *Id.* Here, these factors weigh against certification.

*First*, individual lawsuits are usually preferable to class actions. *See generally Dukes*, 564 U.S. at 348–49. Defendants recognize that class actions may often be preferable in the context of low-dollar disputes, which can be expensive for little payoff. However, the FDCPA and FCCPA contain mechanisms to counter these concerns: the availability of statutory damages and a prevailing party attorneys' fees provision. *See* 15 U.S.C. § 1692k(a); Fla. Stat. Ann. § 559.77(2).

Thus, because putative class members have the ability to assert individual actions that may extend well beyond such "low dollar disputes," such individual actions are superior in this context.

*Second*, "the predominance analysis has a tremendous impact on the superiority analysis . . . the less common the issues, the less desirable a class action will be as a vehicle for resolving them." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010). As explained above, the Court must adjudicate numerous individual questions for each and every putative class member to determine whether or not that class member has a claim.  These extensive individualized inquiries further cut against superiority.

## <u>CONCLUSION</u>

Plaintiffs have failed to meet their burden of showing that their proposed class satisfies the prerequisites of Rule 23(a) and Rule 23(b)(3). Therefore, Selene respectfully asks the Court to deny their Motion for Class Certification.

Respectfully submitted,

/s/ Sara D. Accardi
Sara D. Accardi, Esq.
Florida Bar No. 106923
**BRADLEY ARANT BOULT CUMMINGS LLP**
1001 Water Street, Suite 1000
Tampa, FL 33602
T: (813) 559-5500 | F: (813) 229–5946
Primary email: saccardi@bradley.com
Secondary email: jbrandt@bradley.com
*Counsel for Defendant, Selene Finance, LP*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that the foregoing was filed on June 28, 2024, using the CM/ECF

System and service of the foregoing has been furnished to all parties of record.

/s/ Sara D. Accardi
Sara D. Accardi