UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

CASE NO. 23-14297-CIV-CANNON/McCabe

CLARISSA CRUZ, KATRINA MARTIN,
and ROBERT ALLAN MARTIN
individually and behalf of others
similarly situated,

      Plaintiffs,

v.

SELENE FINANCE, LP,

      Defendant.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS

**THIS CAUSE** comes before the Court upon Plaintiffs' Motion to Certify Class (the "Motion") [ECF No. 47]. The Court has reviewed the Motion, Plaintiffs' Memorandum of Law in Support of the Motion [ECF No. 49], Defendant's Amended Response in Opposition [ECF No. 75], Plaintiffs' Reply [ECF No. 79], the full record, and the applicable law. Following review, the Motion [ECF No. 47] is **GRANTED** for the reasons stated below.

### RELEVANT BACKGROUND

This Order assumes a general understanding of the factual background as detailed in the Court's prior substantive orders [ECF Nos. 111, 112], and provides factual context as needed in the Discussion below. As narrowed by the Court's prior order granting in part Defendant's Motion to Dismiss [ECF No. 111], the operative Complaint brings five Counts under the Fair Debt Collection Practices Act (the "FDCPA"), *see* 15 U.S.C. § 1692 *et seq*., and the Florida Consumer Collection Practices Act (the "FCCPA"), *see* Fla. Stat. § 559.55 *et seq*. [ECF No. 15]. Plaintiffs assert that Defendant, a mortgage loan servicer, violated the FDCPA and the FCCPA when it

issued allegedly false, threatening, misleading, and/or deceptive form default-notice letters (the "Default Notice") to thousands of residential mortgage loan holders [ECF No. 15 ¶¶ 8–54; ECF Nos. 15-1, 15-2]. Plaintiffs sue for injunctive relief prohibiting Defendant's continued use of what they allege are illegal debt collection practices, in addition to actual damages, statutory damages, and reasonable attorneys' fees [ECF No. 15 ¶¶ 65, 201; ECF No. 15 p. 35]

Plaintiffs' claims under the FDCPA and FCCPA stem from the form language and headline contained in the Default Notice, which states, in part:

**NOTICE OF DEFAULT AND INTENT TO ACCELERATE**

. . .

Failure to cure default on or before the date specified may result in acceleration of the sums secured by the Security Instrument, sale of property and/or foreclosure by judicial proceeding and sale of the property.

[ECF Nos. 15-1, 15-2]. As alleged, Defendant sends the Default Notice to individual mortgage holders through its automated system when a mortgage holder's loan is 45 days delinquent, and automatically generates a cure date that is 81 days after the initial default (or 36 days from when the Default Notice is issued) [ECF No. 89 p. 7 n.7]. Defendant's own internal policies provide that Defendant does not accelerate loans until a mortgage holder is 120 days delinquent, and federal law similarly prohibits initiation of foreclosure proceedings prior to 120 days of delinquency [ECF No. 15 ¶ 225 (citing 12 U.S.C. § 2601 *et seq.* and 12 C.F.R. § 1024.41); ECF No. 15 ¶ 88]. Thus, although Plaintiffs do not dispute that they defaulted on their mortgage loan obligations [ECF No. 15 ¶¶ 44, 51], Plaintiffs allege that the above-referenced language in the Default Notice violates the FDCPA and FCCPA because it misleads consumers into believing that Defendant would prematurely accelerate their loans or foreclose their homes when Defendant never intended to do so as quickly or was legally barred from doing so as quickly [ECF No. 15 ¶¶ 22, 24–25].

Counts I through III (with Counts II and III pled in the alternative) are brought under 15 U.S.C. § 1692e, e(5), and e(10), which respectively prohibit the use of any "false, deceptive, or misleading representation or means in connection with the collection of any debt," a "threat to take any action that cannot legally be taken or that is not intended to be taken" in connection with collection of a debt, and "[t]he use of any false representation or deceptive means" to collect a debt [ECF No. 15 ¶¶ 66–141]. Count IV is brought in the alternative under 15 U.S.C. § 1692f, which prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt" [ECF No. 15 ¶¶ 142–165]. And Count V is brought under Fla. Stat. § 559.72, which prohibits debt collectors from "willfully engag[ing] in . . . conduct which can reasonably be expected to abuse or harass the debtor . . . ." [ECF No. 15 ¶¶ 166–201]. The Court previously determined in its order on Defendant's Motion to Dismiss that Plaintiffs have stated plausible violations of the relevant provisions of the FDCPA and FCCPA, as judged under the "least-sophisticated consumer" standard [ECF No. 111].

Plaintiffs now seek to certify the following proposed classes (collectively the "Proposed Classes") under Rule 23 of the Federal Rules of Civil Procedure [ECF No. 49 p. 9]:

1. **<u>Florida State Law Class</u>**: All Florida residential mortgagors to whom Selene sent a letter substantially similar or materially identical to the Final Letter warning of acceleration of the home loan and/or commencement of foreclosure proceedings upon less than full payment of the "amount due" or "default amount," within the applicable statute of limitations period (the "Florida Class").

2. **<u>FDCPA Sub-Class</u>**: All Florida residential mortgagors whose mortgage servicing was transferred to Selene while in a state of default to whom Selene sent a letter substantially similar or materially identical to the Final Letter warning of acceleration of the home loan

3

and/or commencement of foreclosure proceedings upon less than full payment of the "amount due" or "default amount" within the applicable statute of limitations period (the "FDCPA Class").

The relevant period for the Florida Class begins on August 16, 2021, and the relevant period for the FDCPA Class begins on August 16, 2022; both class periods extend through the date of notice [ECF No. 49 p. 10]. Plaintiffs filed the instant Motion on May 20, 2024 [ECF No. 47]. The Motion is ripe for adjudication [ECF Nos. 75, 79].

## LEGAL STANDARDS

"A district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (internal quotation marks omitted)). The plaintiff must establish (1) the four requirements listed in Rule 23(a) of the Federal Rules of Civil Procedure and (2) at least one of Rule 23(b)'s three subsections. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Under Rule 23(a), a plaintiff seeking to certify a class must establish:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).

If the plaintiff satisfies the Rule 23(a) threshold, the plaintiff then must show that the action satisfies at least one of the subsections of Rule 23(b). Where, as here, a plaintiff relies upon the

predominance factor as rooted in Rule 23(b)(3), the plaintiff must show (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). As quoted from the Rule, the matters pertinent to these findings include:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing the class.

Fed R. Civ. P. 23(b)(3)(A)–(D).

District courts possess wide latitude in determining whether to certify a class, *see Coon v. Ga. Pac. Corp.*, 829 F.2d 1563, 1566 (11th Cir. 1987), but as noted, a rigorous assessment is required to ensure that the action satisfies the prerequisites of Rule 23, *Vega*, 564 F.3d at 1266. This analysis often "entail[s] some overlap with the merits of the plaintiff's underlying claim," and "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *see also Vega*, 564 F.3d at 1266 ("Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." (internal quotation omitted)). As a result, "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc.*, 564 U.S. at 351.

Finally, "[n]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (citations omitted). They "must demonstrate [their own] standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). The requisite elements of standing are as follows: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 333 (citations omitted).

## DISCUSSION

Plaintiffs seek certification of the Proposed Classes pursuant to Federal Rule of Civil Procedure 23 [ECF No. 47]. Defendant opposes certification on the view that named Plaintiffs Clarissa Cruz, Robert Allan Martin, and Katrina Martin lack Article III standing because they have not sustained a concrete injury and therefore cannot represent the Proposed Classes [ECF No. 75 pp. 7–13]. On the merits of Rule 23, Defendant contends that Plaintiffs have failed to satisfy the typicality and adequacy requirements under Rule 23(a) and also failed to satisfy the predominance and superiority prerequisites under Rule 23(b)(3) [ECF No. 75 pp. 13–20].

Upon full review, the Motion is granted. Plaintiffs have adequately alleged injuries sufficient to confer Article III standing for the claims alleged, and they have otherwise satisfied the requirements for class certification under Rule 23.

## I.    Article III Standing

### A.    Legal Principles

To establish standing under Article III, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*

*LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)); *see Spokeo,* 578 U.S. at 338.   "The Supreme Court 'has rejected the argument that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 924 (11th Cir. 2020) (quoting *Thole v. U.S. Bank, N.A.*, 590 U.S. 538, 546 (2020)); *see Spokeo*, 578 U.S. at 341 ("[A] bare procedural violation, divorced from any concrete harm, [cannot] satisfy the injury-in-fact requirement of Article III.").   Rather, "Article III standing requires a concrete injury even in the context of a statutory violation."  *Spokeo*, 578 U.S. at 341.  Put another way, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *TransUnion LLC*, 594 U.S. at 427.

Importantly, an injury can still be "concrete" even though it is intangible.  *Id.* at 340; *Drazen v. Pinto*, 74 F.4th 1336, 1339 (11th Cir. 2023) ("Obvious concrete harms include physical injury and financial loss.  But intangible harms—an invasion of privacy, for example—may also satisfy the concreteness requirement.").  In fact, "very nearly any level of direct injury is sufficient to show a concrete harm." *Muransky*, 979 F.3d at 920, 927.   While the Eleventh Circuit has not addressed in a published decision whether emotional harm, standing alone, is a sufficiently concrete injury for standing purposes, it has found standing where emotional distress corresponds with an accompanying tangible or physical injury, such as loss of sleep or wasted time spent resolving issues caused by a defendant's conduct.  *See Toste v. Beach Club at Fontainebleau Park Condo. Ass'n., Inc.*, No. 21-14348, 2022 WL 4091738, at *4 (11th Cir. Sept. 7, 2022) (citing *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021)).  More broadly, courts have found Article III standing in FDCPA actions like this one based solely on the consumer's emotional

injury and, more commonly, where the emotional injury is accompanied by the threat of future harm. *See Ben-Davies v. Blibaum & Assocs., P.A.*, 695 F. App'x 674, 676 (4th Cir. 2017) (explaining that "emotional distress" resulting from FDCPA violations is more than a "bare procedural violation" under *Spokeo*); *Mraz v. I.C. Sys., Inc*., No. 18-cv-254, 2020 WL 7125629, at *2 (M.D. Fla. Dec. 4, 2020); *Mayfield v. LTD Fin. Servs., L.P.,* No. 20-cv-01966, 2021 WL 4481089, at *3 (S.D. Tex. Sept. 30, 2021).

A risk of future harm can also establish a concrete injury for standing purposes "so long as the risk of harm is sufficiently imminent and substantial[,]" particularly in a suit for injunctive relief. *Trans Union LLC*, 594 U.S. at 435 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) ("A threat of future injury is sufficient to establish [Article III] standing when the threatened injury is certainly impending or there is a substantial risk that the harm will occur." (internal quotations omitted)).  The Supreme Court in *Trans Union LLC* distinguished between the threat of future harm as an independent basis for standing in suits for injunctive relief versus suits for damages— noting that, in suits for injunctive relief, "a person exposed to a risk of future harm may pursue forward-looking [remedies] to prevent the harm from occurring[,]" but clarified that the threat of future injury alone is not sufficiently concrete to confer standing in a suit for damages.  594 U.S. at 435–37.  In drawing that distinction, the majority noted in a parenthetical that where the risk of future harm is accompanied by some other injury, "such as emotional injury[,]" the harm is sufficiently concrete to establish standing to sue for damages.  *Id.* at 437.

With the caveat that Article III standing caselaw in the consumer protection area continues to develop, the following observations can be drawn in broad strokes from available authorities: (1) emotional injury plus a corresponding tangible injury can be enough to establish standing,

CASE NO. 23-14297-CIV-CANNON/McCabe

*Toste*, 2022 WL 4091738, at *4 (citing *Losch*, 995 F.3d at 943); (2) the risk of future harm paired with emotional injury can be sufficient for standing purposes, even in a suit for damages, *TransUnion*, 594 U.S. at 437; and (3) the risk of future harm is sufficient on its own to establish standing in a suit for injunctive relief, so long as the risk of harm is imminent and substantial, *id.* at 435–37.  It remains unclear, however, whether emotional injury alone is enough to establish standing under Eleventh Circuit precedents. *Cf. Preisler v. Eastpoint Recovery Grp.*, No. 20-CV-62268, 2021 WL 2110794, at *12 (S.D. Fla. May 25, 2021) (finding in the FDCPA context that the plaintiff "could not rely solely on his feelings of distress, confusion, or anxiety to fabricate concrete injury" (citing *Cooper v. Atl. Credit & Fin., Inc.*, 822 F. App'x 951, 954 (11th Cir. 2020)); *Rivera v. Dove Inv. Corp.*, No. 19-20934-CIV, 2020 WL 6266054, at *7 (S.D. Fla. Oct. 23, 2020) ("[I]n light of the Eleventh Circuit's determination that '[a]ctual damages under the FDCPA include damages for emotional distress,' this Court agrees [that] allegations of emotional distress are sufficiently concrete to establish Article III standing" (quoting *Minnifield v. Johnson & Freedman, LLC*, 448 F. App'x 914, 916 (11th Cir. 2011))).

### B.    Standing Analysis

As a preliminary matter, the Court notes that all of Plaintiffs' remaining claims are premised on Defendant's act of sending the Default Notice quoted above.[1]  For that reason, given

---

[1] Plaintiffs proceed in the Complaint on various alternative theories of liability under the FDCPA, plus an analogous claim under the FCCPA's companion provision barring abusive or harassing debt-collection practices.  *See* 15 U.S.C. § 1692e (prefatory phrase prohibiting "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt") (Count I); *id.* § 1692f (prefatory phrase prohibiting "unfair or unconscionable means to collect a debt") (Count IV); *id.* § 1692e(5) (prohibiting "threat[s] to take any action that cannot legally be taken or that is not intended to be taken," in connection with debt-collection practices) (Count II); *id.* § 1692e(10) (barring "[t]he use of any false representation or deceptive means" to collect debts) (Count III); Fla. Stat. § 559.72(7) (prohibiting debt collectors from "willfully engag[ing] in other conduct which can reasonably be expected to abuse or harass the debtor") (Count V).  *See also* Fla. Stat. 559.77(5) ("In applying and construing this section, due consideration and great weight

the overlapping nature of the claims asserted (almost all of which are pled in the alternative), the

Court addresses Plaintiffs' claims together, noting distinctions where necessary in the relief

sought.  In so doing, the Court relies on the alleged harms as pled in the Complaint and as gleaned

from the depositions of lead Plaintiffs and Defendant's corporate representative [ECF Nos. 49-1

(Nik Fox), 75-1 (Robert Allan Martin), 75-2 (Katrina Martin), 75-3 (Clarissa Cruz), 75-4].[2]

The alleged injuries in this case fall into three overall categories: emotional injuries

common to all Plaintiffs; risk of future financial injury common to all Plaintiffs; and tangible

injuries specific to two of the three named Plaintiffs.   In the category of emotional injuries, all

Plaintiffs allege that they suffered emotional injuries following receipt of the Default Notice,

including "stress," "anxiety," "a false sense of urgency," "emotional distress," and varying other

forms of emotional disquietude [ECF No. 15 ¶¶ 40, 47, 54; *see* ECF No. 75-1 p. 63 (Robert Allan

Martin testifying that he felt "devastated" after receiving Notice); ECF No. 75-2 pp. 47–48 (Katrin

Martin testifying that the Default Notice was "very shocking" and "heartbreaking"); ECF No. 75-

3 pp. 74–75 (Clarissa Cruz testifying that Default Notice was "worrisome" and made her feel

"nervous")].  With respect to future financial injury, all Plaintiffs allege, pertinent to their request

for injunctive relief, that Defendant's continued use of the Default Notice has "the potential of

causing individuals, including the named Plaintiffs and the putative Class members, to send

additional money to [Defendant] that, absent the false and misleading statements, they could have

---

shall be given to the interpretations of the Federal Trade Commission and the federal courts
relating to the federal Fair Debt Collection Practices Act."); *Oppenheim v. I.C. Sys., Inc.*, 627 F.3d
833, 839 (11th Cir. 2010).

[2] These depositions were filed in support of Plaintiffs' Motion to Certify Class.  It is proper to
consider these materials in evaluating whether Plaintiffs have established Article III standing.
*Green-Cooper v. Brinker Int'l, Inc*, 73 F.4th 883, 888 n.6 (11th Cir. 2023) ("We may review both
the allegations in the complaint and evidence in the record so far to determine whether the named
plaintiffs in this case have established Article III standing for class certification purposes."
(citations omitted)).

utilized on other necessary expenditures, including food and utility payments" [ECF No. 15 ¶ 216]. In other words, Plaintiffs allege, there is a risk of future harm because they could receive additional Default Notices and thus be induced to prematurely pay Defendant money as a result of the misleading threats of acceleration and foreclosure [ECF No. 15 ¶ 216; ECF No. 79 p. 4].  Finally, individual Plaintiffs Katrina Martin and Clarissa Cruz testified in their depositions to having acted in detrimental reliance on the representations in the Default Notice and suffered tangible injuries as a result; specifically, Katrina Martin wasted time on the phone speaking to "many different service representations" in an effort to try "to get somebody to help [her]" [ECF No. 75-2 p. 49], while Clarissa Cruz "felt like [she] had to do something" and thus "dipped into [the] funds" in her retirement account to pay the debt after reviewing the language in the Notice [ECF No. 75-3 pp. 74–75, 79].[3]

According to Plaintiffs, emotional distress alone is enough to establish Article III standing and, in any event, the above-mentioned injuries alleged, when viewed in the aggregate, are sufficiently concrete for standing purposes [ECF No. 79 pp. 3–8].  Defendant, by contrast, argues that neither the Default Notice's "potential to mislead" nor Plaintiffs' claimed emotional harms are sufficient to confer standing under Article III [ECF No. 75 pp. 10–12].  And specific to the tangible injuries of Plaintiffs Katrina Martin and Clarissa Cruz, Defendant argues that Katrina Martin's time spent on the phone "trying to get someone to help [her]" does not qualify as a concrete injury, and that Clarissa Cruz has failed to prove that she withdrew funds from her retirement account in reliance on the Default Notice [ECF No. 75 pp. 12–13].

---

[3] Robert Allan Martin's injuries are limited to emotional injury and the threat of future harm common to all Plaintiffs noted above [*see* ECF No. 75-1; ECF No. 15 ¶ 216].

Without deciding whether emotional harm alone is enough to establish Article III standing, the Court agrees with Plaintiff that the combination of the harms alleged in this case, coupled with the alleged, non-speculative risk of future financial harm common to all Plaintiffs, is sufficient to confer standing on Plaintiffs to sue for retrospective damages and injunctive relief under the relevant provisions of the FDCPA and FCCPA.

### i.   Katrina Martin and Clarissa Cruz

The Court starts with Plaintiffs Katrina Martin and Clarissa Cruz, both of whom testified that they suffered concrete, tangible injuries in the form of wasted time (Katrina Martin) and withdrawn money from a retirement account (Clarissa Cruz) following receipt of the Default Notice [ECF No. 75-2 p. 49; ECF No. 75-3 p. 79]. These harms have traditionally supported a finding of Article III standing in a suit for damages, and Defendant offers an insufficient basis to conclude otherwise [*see* ECF No. 75 pp. 9–13]. *See Trichell v. Midland Credit Mgmt, Inc.*, 964 F.3d 990, 997–1000 (11th Cir. 2020) (stressing the need for "downstream consequences" and "justifiable reliance" to establish Article III standing to sue for damages under the FDCPA and suggesting that "wasted time or money" in determining whether to pay a debt would qualify as justifiable reliance); *see also Losch*, 995 F.3d at 943.[4]

In addition to tangible injuries, Plaintiffs Katrina Martin and Clarissa Cruz have adequately alleged that they suffered a host of emotional injuries as a result of the Default Notice [ECF No.

---

[4] As to Clarissa Cruz, Defendant raises a fair point that she did not directly testify that the withdrawal of funds from her retirement was in specific reliance on the misleading nature of the Default Notice, as she did not pay any cure amount to Defendant until three weeks after the date stated in the Default Notice [ECF No. 75 pp. 12–13]. Nevertheless, at this juncture, the Court is satisfied that Cruz has shown a concrete injury based on the combination of her direct testimony that she reviewed the language of the Default Notice, perceived it as requiring immediate payment, and paid Defendant [ECF No. 75-3 pp. 74–75, 79]. Matters of subject matter jurisdiction may be raised at any time.

75-2 pp. 46–49; ECF No. 75-3 pp. 74–75].[5]  Katrina Martin testified that the Default Notice was

"very shocking" and "heartbreaking" [ECF No. 75-2 pp. 47–48]; and Clarissa Cruz described the

Default Notice as "worrisome" and said that it caused her to feel "nervous" [ECF No. 75-3 pp. 74–

75].  While Defendant urges that the Eleventh Circuit's decision in *Trichell* requires a finding that

Plaintiffs lack standing, the Court disagrees [ECF No. 75 pp. 9–10].   There, the Eleventh Circuit

addressed claims under the FDCPA in a suit for damages and concluded the plaintiffs lacked

Article III standing because they merely alleged "informational injuries" and did not allege that

the subject collection letter actually misled plaintiffs or otherwise caused "downstream

consequences." *Trichell*, 964 F.3d at 1003–04.  As explained, Plaintiffs here have alleged that

they suffered more than purely "informational injuries" and have, in fact, suffered emotional and

tangible concrete injuries resulting from the Default Notice sufficient to establish Article III

standing.

Finally, to support their request for injunctive relief, Katrina Martin and Clarissa Cruz

allege that Defendant's continued use of the Default Notice poses an imminent risk of misleading

them and has the potential to induce future action that is against their financial interests [ECF No.

15 ¶ 216].  These allegations are supported by their sworn testimony that the Default Notice caused

them uncertainty regarding their loan obligations [ECF No. 75-2 pp. 46–49; ECF No. 75-3 p. 74].

For example, there is record evidence that Defendant's policy is to send additional Default Notices

to mortgage holders if a mortgage holder pays anything less than the total cure amount [ECF No.

49-1 pp. 106–107; ECF No. 49-1 pp. 160–162], and Defendant has not proffered any evidence

indicating that it has modified the Default Notice's language or otherwise changed its uniformly

---

[5] Insofar as Defendant disputes whether Plaintiffs have suffered enough of an emotional injury to confer standing, "severe harm is not the *sine qua non* of Article III standing."  *Mraz*, 2020 WL 7125629, at *2 (citing *Muransky*, 979 F.3d at 927).

applied debt collection policies since this litigation ensued.  Thus, on this record, and for purposes of the claim for injunctive relief, the Court is satisfied that Plaintiffs have shown a sufficiently imminent and substantial risk of future financial harm sufficient to support Article III standing.

Viewing the record in its totality as to Katrina Martin and Clarissa Cruz, these Plaintiffs have established their standing to sue for damages and injunctive relief under the relevant provisions of the FDCPA and FCCPA.

ii.    **Robert Martin**

In contrast to Plaintiffs Katrina Martin and Clarissa Cruz, Robert Martin has not alleged or testified that he took specific detrimental actions in reliance on the Default Notice [*see* ECF No. 75-1].  But Robert Martin joins the other Plaintiffs in their allegation that Defendant's continued use of the Default Notice poses a risk of future financial harm [ECF No. 15 ¶ 216].  And the record reflects that Robert Martin is no exception to Defendant's uniform application of its debt collection practices [ECF No. 49-1 pp. 160–162].  These allegations and record evidence of imminent future harm are sufficient to confer standing on Robert Martin to sue for injunctive relief.

This leaves the question of Robert Martin's standing to sue for damages.  As noted, the Supreme Court has suggested that the threat of future harm can be sufficiently concrete for standing purposes in a suit for damages if the threat future harm is accompanied by an independent emotional injury stemming from the risk of future harm itself.  *See TransUnion*, 594 U.S. at 437. That is the case here; Robert Martin felt "devastated" because he thought that he was required to pay Defendant additional money prematurely or face the consequences of acceleration and foreclosure [ECF No. 75-1 p. 63], and more generally, he alleges that he suffered emotional injuries as a result of the Default Notice's misleading language [ECF No. 15 ¶¶ 40, 47].  On this record, Robert Martin has standing to sue for damages in addition to the requested injunctive relief.

The Court now proceeds to evaluate whether Plaintiffs have satisfied the requirements for certification under Federal Rule of Civil Procedure 23.

## B.        Rule 23(a)

With respect to the requirements of Rule 23(a), Defendant's contention is that Plaintiffs have not met the threshold requirements of Rule 23(a)(3) and (4).  This is so, Defendant maintains, because (1) Plaintiffs are atypical of the class they seek to represent and (2) Plaintiffs cannot adequately represent the proposed class.  Upon examination of all four prerequisites for class certification, *see Vega*, 564 F.3d at 1266, the Court concludes that Plaintiffs have satisfied the Rule 23(a) requirements.

### 1.        The Proposed Classes are ascertainable

"Rule 23 implicitly requires that the 'proposed class is adequately defined and clearly ascertainable.'" *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)).  The class is ascertainable and readily defined where "the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." *Id.*  In support of their argument that the Proposed Classes are ascertainable and readily defined, Plaintiffs provide evidence that Defendant has compiled internal databases containing the loans that were in default (or treated as in default), and which loan holders were sent a Default Notice upon default during the relevant periods, with corresponding addresses for the individual loan holders [ECF No. 49 pp. 11–12; 49-1 p. 177].  Defendant's internal databases also store each Default Notice that was sent during the relevant period [ECF No. 49-1 pp. 134–135].  Thus, Plaintiff maintains that Defendant is capable of running a query in its internal databases to identify each individual loan holder that was issued a Default Notice during the relevant periods [ECF No. 49 p. 11; 49-1 pp. 15, 18].  Defendant does not dispute

this evidence [*see* ECF No. 75].  Plaintiffs have therefore provided evidence of a logistically feasible methodology for ascertaining the members of the Proposed Classes.

### 2.      Numerosity

Rule 23(a)(1) requires a class to "be so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This is generally a "'low hurdle,' and 'a plaintiff need not show the precise number of members in the class.'"  *Schojan v. Papa Johns Int'l, Inc*., 303 F.R.D. 659, 664 (M.D. Fla. 2014) (quoting *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013)).  The Eleventh Circuit has stated that, "[w]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors."  *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

Plaintiffs have provided evidence that there are 14,729 Florida Class members and approximately 3,000 FDCPA Class members [ECF No. 49-1 pp. 132–35, 176].  Defendant does not dispute this point or offer a meaningful challenge to numerosity [*see* ECF No. 75 pp. 13–14].  Plaintiffs have met their relatively low burden of establishing numerosity under Rule 23(a)(1) for each Proposed Class.

### 3.      Commonality

To establish commonality, a plaintiff must show that the complaint contains "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality "does not require that all questions of law and fact raised by the dispute be common."  *Vega*, 564 F.3d at 1268.  Instead, a plaintiff need only establish "at least one issue common to all class members." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D. Fla. 2003).  This is a "low hurdle." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

There is sufficient record evidence to conclude that Plaintiffs have satisfied the commonality requirement. The record indicates that the Default Notices sent to individual loan holders are materially identical (except for the default and cure amount specific to each loan holder); were generated by Defendant through an entirely automated process [ECF No. 49-1 pp. 52–53, 87–88]; and were sent to individual lenders pursuant to Defendant's uniform policy of sending a Default Notice upon 45 days of delinquency [ECF No. 49-1 pp. 76–77]. *See Swanson v. Mid Am, Inc.*, 186 F.R.D. 665, 668 (M.D. Fla. 1999) ("To establish commonality, it is sufficient that Plaintiff allege that all class members received the same collection letter."). Defendant raises no challenge to these contentions. Furthermore, the same legal issues apply to Plaintiffs and each member of the Proposed Classes, most notably, whether "the least sophisticated consumer" would have interpreted the Default Notice to be misleading and/or threatening. *See Jeter v. Credit Bureau, Inc*., 760 F.2d 1168, 1175 (11th Cir. 1985). Plaintiffs have met the relatively low threshold of showing commonality, which Defendant does not challenge.

### 4. Typicality

Pursuant to Rule 23(a)(3), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "'A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).'" *Vega*, 564 F.3d at 1275 (quoting *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008)). To establish typicality, "there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). The class representative's claims are typical "if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal

theory." *Williams*, 568 F.3d at 1357. "Like commonality, typicality is not a demanding test." *County of Monroe v. Priceline.com, Inc.*, 265 F.R.D. 659, 668 (S.D. Fla. 2010).

As discussed above, Plaintiffs have provided sufficient record evidence that the Default Notices were sent pursuant to Defendant's uniform policy; and Defendant has failed to raise any factual discrepancies among the Default Notices sent to individual loan holders that would prevent a finding of typicality [ECF No. 49-1 pp. 160–62]. Defendant's only contention with regards to typicality is specific to Plaintiff Clarissa Cruz, arguing that she is subject to a unique defense [ECF No. 75 p. 14]. Defendant argues that Cruz cannot satisfy an essential element of her claims under the FDCPA and FCCPA because her loan was not "primarily for personal, family, or household purposes." *See* 15 U.S.C. § 1692a(5) (defining "debt," which is a necessary element to claims under the FDCPA, as "any obligation . . . arising out of a transaction . . . primarily for personal, family, or household purposes"); Fla. Stat. § 559.55(6) (same). First, the Court observes that this supposed defense unique to Cruz hardly finds support in the record, in that the only factual basis provided for deeming Cruz's loan commercial as opposed to personal is the fact that Cruz did not inhabit her residential property for eleven months after purchasing it [ECF No. 75 p. 14]. More generally, the presence of a unique defense does not necessarily undermine typicality. *Ross v. Bank South, N.A.*, 837 F.2d 980, 991 (11th Cir. 1988), *vacated on other grounds*, 848 F.2d 1132 (11th Cir. 1988) ("Although the existence of an arguable defense *can* be taken into account by the district court, the court is not *required* to deny certification for such speculative reasons" (emphases in original)). The more fundamental consideration is whether, applying the lenient test referenced above, Cruz's claims arise from the same pattern of alleged misconduct against the Proposed Class members. And due to the factual reasons discussed previously, Cruz's claims clearly do. Defendant's arguable defense as to Cruz does not undermine typicality here.

### 5. Adequacy of Representation

Rule 23(a)'s final requirement is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry encompasses two factors: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2013). In a more detailed manner, this evaluation considers the "forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class"; "whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation"; "whether plaintiffs have interests antagonistic to those of the rest of the class"; whether the representative possesses "the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative"; and whether the plaintiffs "have abdicated their role in the case beyond that of furnishing their names as plaintiffs." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726–28 (11th Cir. 1987).

Defendant does not posit a conflict of interest between Plaintiffs and the Proposed Class members [*see* ECF No. 75]. Instead, Defendant targets Robert Martin as an inadequate class representative due to gaps in his memory as to what portions of the Default Notice were false or misleading [ECF No. 75 p. 4]. Defendant also argues that all three named Plaintiffs are incapable of representing the class because their claims are barred for failure to comply with the pre-suit notice and cure provision contained within their mortgage contracts (the "Notice Provision") [ECF No. 75 pp. 13–14]. The Court addresses these contentions below.

i.      **Robert Martin**

Beginning with Defendant's attack on Robert Martin's knowledge of the facts, the Court is not persuaded on this record that the cited deficiencies reveal Robert Martin to be an inadequate class representative.  Defendant points to Robert Martin's deposition where he was unable to recall whether he or his wife was the recipient of the Default Notice [ECF No. 75-1 p. 49].  Defendant also refers to a segment in Robert Martin's deposition where he hesitates in explaining exactly how he found certain provisions of the Default Notice to be false or misleading [ECF No. 75-1 pp. 59–60].  Although these points are not to be discounted, the Court determines, under the relevant standards, that Robert Martin has sufficient knowledge of the underlying facts to defeat this aspect of Defendant's adequacy challenge.  *See Kirkpatrick*, 827 F.2d at 726–28.  Specifically, Robert Martin has testified to his familiarity with the underlying mortgage, that he did eventually read the Default Notice, and that he was the subject of Defendant's debt collection practices [ECF No. 75-1 pp. 16–19, 49–51].  And Defendant has not cited any evidence indicating that Robert Martin is not aware of his responsibilities as a class representative.  Thus, the cited gaps in Robert Martin's memory with regard to certain details do not require a finding under the circumstances that he is an inadequate class representative.

ii.      **The Notice Provision**

More broadly, Defendant argues that all three named Plaintiffs are inadequate class representatives because they failed to satisfy a condition precedent in a Notice Provision contained within their mortgage contracts [ECF No. 75 pp. 13–14 (referencing ECF No. 39-1 p. 11)].  Defendant raises this argument formally as an affirmative defense to Plaintiffs' Second Amended Complaint [ECF No. 116 p. 18], and reiterates the view in its challenge to predominance under Rule 23(b)(3) [*see* ECF No. 75 p. 19].

At the hub of this issue is Paragraph 20 in Plaintiffs' mortgage contracts, which is reproduced in full below with italics applied to the disputed text:

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance**.  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a chance in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

*Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action*.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.   The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. (the "Notice Provision")

[ECF No. 39-1 pp. 10–11 (¶ 20); ECF No. 39-3 p. 13 (¶ 20)].   Plaintiffs have not alleged or produced evidence indicating that they afforded Defendant notice or the opportunity to take corrective action prior to filing suit, and thus, according to Defendant, Plaintiffs' claims are legally barred—rendering them inadequate class representatives, and also triggering a lack of predominance [ECF No. 75 pp. 13–14, 19].

To begin, the Court rejects Plaintiffs' resistance to considering the merits of this affirmative contractual defense at the Rule 23 stage [ECF No. 79 p. 9].  Generally, and as noted, an analysis under Rule 23 often entails some overlap with the merits of a plaintiff's underlying claim—and that includes, as here, assessment of affirmative defenses to those claims where such defenses bear on a Rule 23 requirement.  *See, e.g.*, *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 123 (2d Cir. 2022); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 257 (5th Cir. 2020).  The Court thus proceeds to evaluate the merits of the defense insofar as it pertains to the adequacy of Plaintiffs' representation.

Turning to the merits of Defendant's affirmative defense, the Court concludes (without prejudice to the trier of fact) that Defendant's reading of the disputed text in the Notice Provision does not pose a bar to Plaintiffs' adequacy as class representatives.  Defendant argues that the Notice Provision in paragraph 20 of the mortgage contract required Plaintiffs, as Borrowers—prior to initiating this suit—to notify Defendant that Defendant breached its duty under the Note and then to give Defendant a reasonable period to "take corrective action" [ECF No. 75 pp. 13–14 (quoting ECF No. 39-1 pp. 10–11)].  Because none of the named Plaintiffs provided such notice and time to cure, Defendant says they are barred under the terms of the contract from initiating this suit, either as individual litigants or as members of any proposed class [ECF No. 39-1 pp. 10–11].  Plaintiff disagrees, noting that the notice and cure requirements under paragraph 20 do not extend to loan servicers like Defendant but rather are limited to disputes between Borrowers (Plaintiffs) and the Lender [ECF No. 79 pp. 8–11].

Under Florida law, contractual language must be given its ordinary meaning as read within the context in which it appears.  *See, e.g.*, *Fla. Dep't of Envtl. Prot. v. CotractPoint Fla. Parks, L.L.C.*, 986 So. 2d 1260, 1265–66 (Fla. 2008).  When genuine "'ambiguity in meaning remains

after resort to the ordinary rules of construction,'" an ambiguous term is to be construed against

the drafter. *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247 (11th Cir. 2002) (quoting

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979)).[6]

Applying these principles, the most natural reading of the plain language of the Notice

Provision is that it is limited to disputes between the Borrower and the Lender and therefore did

not require Plaintiffs to provide Defendant, a loan servicer, with notice as a condition precedent to

filing suit [ECF No. 39-1 pp. 10–11 (¶ 20); ECF No. 39-3 p. 13 (¶ 20)].  This conclusion flows

from two primary points.  First, the mortgage contract repeatedly refers to the terms Borrower and

Lender, both terms at the outset of the contract and used throughout [ECF No. 39-1 p. 1; ECF No.

39-3 p. 1].  Then, in paragraph 20, the mortgage contract for the first time defines the term "Loan

Servicer," explaining in that definition that the Borrower's Note can be sold to a Loan Servicer

and that the Borrower's obligation to make periodic payments on the Note will remain if the Note

is sold to a Loan Servicer [ECF No. 39-1 pp. 10–11].  There is no dispute that Plaintiffs are

"Borrowers" within the meaning of the mortgage contract; nor does Defendant contest that it

qualifies as a "Loan Servicer."  This leads to the second point—and the fundamental textual

point—which is that the Notice Provision at issue omits any reference to "Loan Servicer,"

referencing only "Borrower" and "Lender" when setting out the pre-suit notice requirements

[ECF No. 39-1 pp. 10–11].  Indeed, the Notice Provision states, in pertinent part, that "Neither

---

[6] The Court assumes that Florida law applies to evaluation of the mortgage contracts; neither contract contains a choice of law designation, and both contracts concern residential properties in Florida [ECF Nos. 39-1, 39-3].  In any event, the principles of contract interpretation cited herein are general in nature, and the Court sees no reason at this stage to believe that application of a different state's contract law would alter the plain-language conclusions reached in this Order.  *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) (whole-text canon).

Borrower nor Lender may commence . . . any judicial action[] . . . that arises from the *other party's actions pursuant to this Security Instrument*." That language refers to commencement of judicial actions by the parties to the mortgage contract—under the contract—and against the "other party" to the contract, which Defendant as Loan Servicer is not [ECF No. 39-1 pp. 10–11]. *See Pursuant to*, Black's Law Dictionary (12th ed. 2024) (defining "pursuant to" as "in compliance with" or "under"). Similarly, the provision goes on to require that the "Borrower" or "Lender" must "afford[] the *other party hereto* a reasonable period . . . to take corrective action" [ECF No. 39-1 pp. 10–11 (¶ 20)]. This again refers to disputes arising between the parties to the mortgage contract, not Loan Servicers. The Court cannot overlook the obvious absence of any reference to Loan Servicer in the Notice Provision at issue. For these reasons, at least for purposes of Rule 23, the Court is not persuaded that Plaintiffs' failure to provide Defendant with pre-suit notice and an opportunity to cure renders Plaintiffs inadequate class representatives.[7]

To summarize the Court's conclusions thus far, Plaintiffs have adequately alleged Article III standing and have satisfied the requirements of Rule 23(a) (ascertainability, numerosity, commonality, typicality, and adequacy). Rule 23(b)(3) comes next.

---

[7] Earlier in this proceeding, Defendant moved to strike Plaintiffs' jury trial demand according to a jury trial waiver provision contained in Paragraph 25 of Plaintiffs' mortgage contracts [ECF No. 39]. The Court concluded, based on the broad language in the provision and applicable law, that Defendant can enforce a jury trial waiver contained in Plaintiffs' mortgage contracts, even though Defendant is not a party to the contracts [ECF No. 111]. That prior decision regarding the jury waiver provision does not conflict with this one. The jury trial waiver provision is drafted in broad terms that are applicable at least to agents of the original lender [ECF No. 111; ECF No. 39-1 ¶ 25 ("The Borrower hereby waives any right to a trial by jury in any action . . . arising out of or in any way related to this Security Instrument or the Note")]. The Notice Provision, by contrast, is much more narrowly drafted and cabined to disputes between the parties to the mortgage contract.

**B.      Rule 23(b)(3)**

Plaintiffs seek to certify a class under Rule 23(b)(3) [ECF No. 49 p. 17].  Rule 23(b)(3) has two components: predominance and superiority.  The predominance factor as rooted in Rule 23(b)(3) requires that the plaintiff seeking certification show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed R. Civ. P. 23(b)(3).

**1.      Predominance of Common Issues**

"Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief."  *Klay v. Humana, Inc.*, 382 F.3d 1251, 1255 (11th Cir. 2004), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  The predominance inquiry under Rule 23(b)(3), however, is more demanding than the commonality requirement under Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) ("The predominance inquiry focuses on the legal or factual questions that qualify each class member's case as a genuine controversy, and is far more demanding than Rule 23(a)'s commonality requirement." (internal quotation marks omitted)).  Common issues do not predominate over individual questions if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims."  *Klay*, 382 F.3d at 1255.

Common issues predominate in this action.  As noted, the core of Plaintiffs' claims is the misleading, false, and/or threatening nature of the Default Notice and whether Defendant intended to accelerate individual loans or could legally initiate foreclosure proceedings [ECF No. 15 ¶¶ 22,

24–25; ECF No. 15 ¶ 225 (citing 12 U.S.C. § 2601 *et seq.* and 12 C.F.R. § 1024.41); ECF No. 15 ¶ 88]. The claims of Plaintiffs and the class members are based on objective criteria: each Default Notice is identical, Defendant applies its policies for issuing Default Notices uniformly [ECF No. 49 p. 18; ECF No. 49-1 pp. 75–76], and Plaintiffs and every class member will have their claims evaluated under the "least-sophisticated consumer" standard, which by its nature does *not* focus on individual findings of whether a particular loan holder was actually misled [ECF No. 49 p. 8]. Furthermore, Plaintiffs and every class member are alleged to have suffered the same type of injury, i.e., they were misled, deceived, or threatened by the language of the Default Notice, with that language leading to emotional harm and a risk of future financial harm [*see* ECF No. 15 ¶¶ 40, 216].

Despite the identical nature of Plaintiffs' claims and the claims asserted on behalf of the Proposed Class members, Defendant argues that Plaintiffs fail to satisfy the predominance requirement because of certain unique issues. The Court has evaluated those concerns and disagrees.

First, Defendant argues that whether individual class members have Article III standing will require individualized findings that will predominate over any common questions of law and fact [ECF No. 75 pp. 15–16 (urging that standing analysis will require individualized findings of whether a class member (i) received a Default Notice, (ii) read the Default Notice, (iii) relied on the Notice to their detriment and the like)]. On this record, the Court is not persuaded. Although the Supreme has not decided whether each putative class member must establish standing prior to certification, *see TransUnion*, 594 U.S. at 413 n.4, the Eleventh Circuit described the district court's inquiry into the putative class members' standing at the certification stage as follows:

> We do not hold today that a court is required to ensure that the class definition does not include *any* individuals who do not have standing before certifying a class . . .

> Rather, we only hold that in this case the district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing, as it seems at first blush here, and making that determination for these members of the class will require individualized inquiries.

*Cordoba v. DIRECTTV, LLC*, 942 F.3d 1259, 1276–77 (11th Cir. 2019) (emphasis in original). The Court has conducted that analysis here and sees no reason to believe that a "large portion" of the Proposed Classes did not suffer concrete injuries like those experienced by Plaintiffs such that individualized issues of standing will predominate.  Nor is the Court required to speculate whether every class member has standing at the certification stage.  *See id*; *see also Tyson Foods, Inc.*, 577 U.S. at 463–64 (2016) (affirming denial of motion for decertification where "it [was] undisputed that hundreds of class members suffered no injury . . . .") (Roberts C.J., concurring).   Indeed, Defendant provides no record evidence to indicate that a significant number of class members did not receive or read the Default Notice and therefore failed to act in reliance or face any downstream consequences [*see* ECF No. 75].  And there is evidence that Defendant has an automated policy of sending the Default Notice once a loan holder is in default.  Under these facts, and incorporating the Court's standing analysis above, the Court disagrees that individualized determinations of class members' standing prevent certification.

Second, Defendant argues that damages for the class members will require individualized proof predominating over the common questions of law and fact in this case [ECF No. 75 pp. 16–17].  As a starting point, the presence of individualized damage issues ordinarily "does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (collecting cases).  This is especially the case here given the predomination of common issues regarding class-wide liability, for the reasons stated above, and the absence of any discernably unique difficulties in calculating damages.  *See Carriuolo v. Gen.*

*Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) ("[I]ndividualized damages calculations are insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member."); *see also Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) ("[I]ndividual damages defeat predominance if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.").  Further, the FDCPA and FCCPA provide ready-made formulas for calculating damages in the class action context, 15 U.S.C. § 1692k(a)(2)(B); Fla. Stat. § 559.77(2)—a further reason to conclude that class-wide damages will not be overly difficult to calculate.  Finally, the FDCPA and FCCPA provide for statutory damages capped at $1000, independent of any provable actual damages suffered by individual class members.  15 U.S.C. § 169 2k(a)(2)(A); Fla. Stat. § 559.77(2).  This statutory reality, in combination with the Eleventh Circuit's general disinclination to permit individualized damages to defeat predominance, is enough on these facts to reject Defendant's challenge to Rule 23(b)(3).

Third, Defendant reiterates its contention that the individualized, "fact-specific" inquiry of whether each class member's mortgage loan was "primarily for personal, family, or household purposes" prevents certification [ECF No. 75 pp. 17–18].  15 U.S.C. § 1692a(5); Fla. Stat. § 559.55(6).  The Court finds no bar to certification on this basis.  While Defendant is correct that the threshold inquiry for the class members' claims under the FDCPA and FCCPA is whether the loans are for personal use, the Court is persuaded that this evaluation will not predominate over the common legal and factual issues described above.  *Hicks v. Client Servs., Inc.*, No. 07-61822-CIV, 2008 WL 5479111, at *6 (S.D. Fla. Dec. 11, 2008) ("[T]he need to show that the transactions involved in a particular case are consumer transactions is inherent in every FDCPA class actions.  If that need alone precluded certification, there would be no class actions under the FDCPA.")

(collecting cases).  Plaintiffs note that whether each class members' loan was for personal or commercial use can be gleaned from the loan applications filed with the original lender, and that other means exist, such as proper drafting of the claim form, to help exclude commercial loan holders from the class [ECF No. 79 p. 18].  *See id.*  Finally, there is no record evidence—as to the proposed classes—that Defendant sent Default Notices to any commercial or non-personal loan holders [*see* ECF No. 75].

Accordingly, the Court finds that questions of law or fact common to all members of the Proposed Classes predominate over any questions affecting only individual members.[8]

### 2.      Superiority

When evaluating the superiority inquiry, courts focus on '"whether there is a better method of handling the controversy than through the class action mechanism."'  *Klay*, 382 F.3d at 1269 (quoting *In re Managed Care Litig.*, 209 F.R.D. 678, 692 (S.D. Fla. 2002)).  As such, the most relevant consideration in the superiority analysis is whether class certification would result in case management issues that render the proceedings "less fair and efficient" than other available forums for adjudicating the class members' claims.  *See In re Managed Care Litig.*, 209 F.R.D. at 692. Moreover, whether common issues predominate over all class members' claims "has a tremendous impact on the superiority analysis of [Rule 23(b)(3) for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims."  *Klay*, 382 F.3d at 1269.

Plaintiffs argue that proceeding in the class action format is superior in this case because the key questions of liability arise from Defendant's uniform debt collection policies, class

---

[8] Defendant also relies on the Notice Provision to resist predominance [ECF No. 75 p. 19]. For essentially the same reasons stated above in the context of adequacy, *supra* pp. 20–24, viewing the plain terms of the subject contract, the Court does not agree.

certification would promote the preservation of judicial resources, and granting class certification would not hinder the Court's management of this case, among other reasons [ECF No. 49 pp. 19–21].  Defendant disagrees, generally reiterating its predominance arguments and maintaining that a class format could prevent some class members from seeking greater damage awards in higher-value litigation [ECF No. 75 pp. 20–21].  The Court agrees with Plaintiffs.

Plaintiffs have made a sufficient showing that the class mechanism is a superior method of adjudicating their claims, all of which revolve around Defendant's uniform debt collection Notice. The alternative to class certification here—piecemeal litigation by individual loan holders—is less efficient than resolving all claims collectively in one action.  In addition, Plaintiffs already have shown that the potential class members can be readily identified through Defendant's internal databases and ultimately notified of this case.  And, although some potential members of the class may wish to pursue their claims individually to maximize the award of damages, those members can protect their interests by opting out of the class as permitted by law and this Court's orders.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion to Certify Class [ECF No. 47] is **GRANTED**.

2. Should circumstances change or new record evidence come to light with respect to the propriety of class certification or the adequacy of the class definitions, the parties may move at a later date to decertify or modify the classes as defined in this Order.  *See generally Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

CASE NO. 23-14297-CIV-CANNON/McCabe

3. On or before **December 12, 2024**, the parties shall jointly file a Status Report with proposed remaining deadlines and any other information pertinent to managing this case going forward.  The temporary stay on deadlines [ECF No. 115] remains in effect pending further Court order.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 20th day of November 2024.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record